Glenn K. OKADA, William E. Takabayashi, and Richard A. Cooke, Jr., Plaintiffs-Appellees,

v.

MGIC INDEMNITY CORP., also known as AMBAC Indemnity Corp. and WMBIC Indemnity Corp., Defendant-Appellant.

No. 85–2501.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 25, 1986.

Decided July 31, 1986.

Amended July 8, 1987.

Corrected Aug. 10, 1987.

Wallace A. Christensen, Washington, D.C., for defendant-appellant.

John S. Edmunds, Honolulu, Hawaii, for plaintiffs-appellees.

Before FERGUSON, CANBY and HALL, Circuit Judges.

FERGUSON, Circuit Judge:

Defendant MGIC Indemnity Corporation ("MGIC") appeals the district court's grant of summary judgment in favor of plaintiffs Glenn K. Okada, William E. Takabayashi, and Richard A. Cooke, Jr. ("insureds"), who were insured under a Directors and Officers Errors and Omissions policy issued by MGIC. The district court ruled that MGIC had a duty to pay the defense costs of insureds as those costs came due in lawsuits alleging losses caused by the insureds as directors of a savings and loan association ("the underlying lawsuits"); that more than one potentially covered "loss" was involved; and that MGIC acted in bad faith by refusing to pay, without condition, the insureds' defense costs in the underlying lawsuits, refusing to affirm or deny coverage of claims in the underlying lawsuits, and refusing to enter settlement negotiations in the underlying lawsuits. *Okada v. MGIC Indem. Corp.*, 608 F.Supp. 383 (D.Hawaii 1985).

We affirm the rulings finding a duty to pay defense costs as they come due and more than one potentially covered "loss,"

but reverse the ruling that MGIC acted in bad faith.

## I.

Plaintiff insureds were three of the eight directors of First Savings & Loan Association of Hawaii ("First Savings"). MGIC issued a Directors and Officers Errors and Omissions insurance policy, the relevant terms of which are:

[T]he insurer agrees:

(a) With the Directors and Officers of the Association that if, during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the Insurer will pay, in accordance with the terms of this policy, on behalf of the Directors and Officers or any of them, their heirs, legal representatives or assigns all Loss which the Directors and Officers or any of them shall become legally obligated to pay.

. . . .

1. DEFINITIONS

. . . .

(d) The term "Loss" shall mean any amount which the Directors and Officers are legally obligated to pay or for which the Association is required to indemnify the Directors or Officers, or for which the Association has, to the extent permitted by law, indemnified the Directors and Officers, for a claim or claims made against the Directors and Officers for Wrongful Acts and shall include but not be limited to damages, judgments, settlements, costs (exclusive of salaries of officers or employees), and defense of legal actions, claims or proceedings and appeals therefrom and cost of attachment or similar bonds; provided, however, such Loss shall not include fines or penalties imposed by law or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

. . . .

3. EXCLUSIONS

(a) Except for Loss for which the Association is required to indemnify the Directors or Officers, or for which the Association has, to the extent permitted by law, indemnified the Directors or Officers, the Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers:

(1) for libel or slander;

(2) based upon or attributable to their gaining in fact of any personal profit or advantage to which they were not legally entitled;

(3) for return by the Directors and Officers of any remuneration paid to the Directors and Officers without the prior approval of the governing bodies of the Association, which payment, without such previous approval, shall be held by the Courts to be in violation of law;

(4) for an accounting of profits in fact made from the purchase and sale and purchase by the Directors or Officers of securities of the Association within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law or common law;

(5) brought about or contributed to by the dishonesty of the Directors or Officers. However, notwithstanding the foregoing, the Directors or Officers shall be protected under the terms of this policy as to any claims upon which suit may be brought against them, by reason of any alleged dishonesty on the part of the Directors or Officers, unless a judgment or other final adjudication thereof adverse to the Directors or Officers shall establish that acts of active and deliberate dishonesty committed by the Directors or Officers with actual dishonest purpose and intent were material to the cause of action so adjudicated.

. . . .

4. LIMITS OF LIABILITY

. . . .

(d) Claims based on or arising out of the same act, interrelated acts, or one or more series of similar acts, of one or more of the Directors or Officers shall be

considered a single Loss and the Insurer's liability shall be limited to the limit of liability stated in Clause 4(b) and 4(c). In the event that more than one Director or Officer is included in the same Loss, it shall be expressly understood that the total amount of such Loss, for the purpose of determining the aggregate limit for each such involved Director or Officer, shall be apportioned pro rata among each such involved Director or Officer unless otherwise mutually agreed upon by the Director or Officer and the Insurer.

5. COSTS, CHARGES AND EXPENSES

(a) No costs, charges and expenses shall be incurred or settlements made without the Insurer's consent which consent shall not be unreasonably withheld; however, in the event such consent is given, the Insurer shall pay, subject to the provisions of Clause 4, such costs, settlements, charges and expenses.

. . . .

(c) The Insurer may at its option and upon request, advance on behalf of the Directors or Officers, or any of them, expenses which they have incurred in connection with claims made against them, prior to disposition of such claims, provided always that in the event it is finally established the Insurer has no liability hereunder, such Directors and Officers agree to repay to the Insurer, upon demand, all monies advanced by virtue of this provision.

The policy covered each loss for up to $1 million each year for each director, with an aggregate annual limit for each director.

In 1980, First Savings became insolvent and the Federal Savings and Loan Insurance Corp. ("FSLIC") took control of the institution. In 1982, First Hawaiian Bank and FSLIC, as assignees of various shareholders' direct and derivative claims, filed the underlying lawsuits in federal district court against all eight directors of First Savings. *See FSLIC v. Alexander*, 590 F.Supp. 834 (D. Hawaii 1984). Each director hired defense counsel in the underlying lawsuits and sought payment from MGIC for the fees incurred. MGIC agreed to pay the costs as they came due, but reserved its rights to contest coverage and to demand reimbursement if the policy did not cover the claims involved.

All eight directors accepted payments with MGIC's reservation of rights for nearly two years. After that time three of them, the insureds here, refused to accept payment with the attached reservation of rights. MGIC therefore stopped paying the defense costs of the three directors, who then filed this action in federal district court seeking a declaratory judgment that MGIC had a duty to pay, without condition, defense costs in the underlying litigation as those costs were incurred. The defense costs in the underlying lawsuits exceeded $1 million at the time of the district court decision.

The district court granted the insureds' motion for summary judgment. It ruled, first, that the policy was ambiguous because clause 5(c) conflicted with clause 1(d) and that the policy should be read against MGIC as the drafter of the adhesion contract. The court concluded that MGIC had a duty to pay the insureds' defense costs in the underlying action as they came due.

Second, the district court ruled that the underlying lawsuits involved separate alleged acts, each of which was a potential "loss" and could have given rise to a distinct claim. Therefore, even though the acts culminated in one result, First Savings' financial collapse, multiple potentially covered "losses" were involved. Because of the policy limits, MGIC could be liable for "multiple millions" in the underlying lawsuits.

Finally, the district court found that MGIC acted in bad faith because it "has refused to affirm or deny coverage, tender defense costs when due, or enter into settlement negotiations." MGIC timely appeals.

## II.

■ The district court had diversity jurisdiction over this case.[1] "A federal court applies the choice of law rules of the state in which it sits ... to determine the substantive law to apply in a diversity action." *Lettieri v. Equitable Life Assurance Soc'y of the United States*, 627 F.2d 930, 932 (9th Cir.1980) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941)). Hawaii courts apply Hawaii state law when the acts covered by the policy occur in Hawaii, the insureds are Hawaii citizens, and the insurance company is not a Hawaii citizen. *See, e.g., Crawford v. Ranger Ins. Co.*, 653 F.2d 1248, 1250 (9th Cir.1981); *State Farm Mut. Auto. Ins. Co. v. Bailey*, 58 Hawaii 284, 568 P.2d 1185 (1977). Thus, Hawaii law governs this case.

We review de novo grants of summary judgment, *First Ins. Co. v. State*, 66 Hawaii 413, 416, 665 P.2d 648, 651 (1983), and contract interpretations, *Hanagami v. China Airlines, Ltd.*, 688 P.2d 1139, 1144 (Hawaii 1984).

## III.

Section 1(d) of the MGIC policy explains the limits of coverage. The policy covers "Loss," which is defined as "the amount which the Directors and Officers are legally obligated to pay ... for a claim or claims made against the Directors and Officers for Wrongful Acts." This language establishes the policy as a liability, rather than indemnity, policy. This interpretation is confirmed by the captions to the policy's declarations, which clearly denominate the policy as "liability insurance."

■ MGIC does at times cryptically refer to its policy as an "indemnity-type policy." Insureds assert that MGIC argued earlier that the policy was an indemnity policy in an effort to avoid contemporaneous liability for defense costs. Whatever the case may be, the policy here is a liability policy. As the Fifth Circuit explained in

*Continental Oil Co. v. Bonanza Corp.*, 677 F.2d 455 (5th Cir.1982):

> In a liability contract, the insurer agrees to cover *liability* for damages. If the insured is liable, the insurance company must pay the damages. In an indemnity contract, by contrast, the insurer agrees to reimburse expenses to the insured that the insurer is liable to pay and has paid.

*Id.* at 459. The policy here, based on loss as incurred and not as loss paid out by insureds, is a liability policy.

■ Since the policy is for liability rather than indemnity, payment by MGIC for loss is not conditioned upon the payment of damages by the directors. Whenever "loss" occurs (i.e., whenever the directors are "legally obligated to pay" on a covered claim), MGIC must pay that amount. The policyholders thus are assured that they need not expend their own funds in order to receive protection for liability.

The costs of the "defense of legal actions" are included in the definition of "Loss" in section 1(d). Thus, in the absence of other provisions, the policy demands that MGIC pay those costs when the directors become legally obligated to pay them. The issue in this case is whether MGIC effectively excluded such contemporaneous payment of costs by modifying the general rule encompassed in section 1(d).

MGIC claims that the provisions of section 5 of the policy (governing "costs, charges and expenses") exclude legal costs from the general rule of contemporaneous recovery. Section 5(a) qualifies the contemporaneous duty to pay costs, charges, and expenses by giving MGIC the right of approval over such expenditures. MGIC's discretion in reviewing costs, charges, and expenses, however, is not unlimited, for approval may not be "unreasonably withheld." MGIC argues that the "defense of legal actions" referred to in section 1(d) is

---

1. The plaintiffs were citizens of Hawaii, and the defendant was a New York corporation with its principal place of business in Wisconsin. Because the insureds alleged that they each accrued over 200 hours of defense counsel costs and that MGIC was liable for the costs, each fulfilled the $10,000 amount in controversy required for diversity jurisdiction. *See* 28 U.S.C. § 1332.

included in the "costs, charges and expenses."

MGIC argues that section 5(c) further limits payment. Section 5(c) allows the payment of "expenses" prior to the disposition of claims. The payment of expenses, however, is within the complete discretion of MGIC. Nowhere does the policy define expenses, or explain how those expenses differ from the broader language of section 5(a), which covers "costs, charges and expenses." We therefore know that the defense of legal actions is covered by the policy, that costs, charges and expenses must be approved by MGIC, but that expenses are excluded from the general duty of contemporaneous payment.

We must interpret the policy to determine whether "expenses," excluded from contemporaneous payment under section 5(c), contain the "defense of legal actions," covered under section 1(d). It is a commonplace that a contract is interpreted to conform to the expectations of the parties at the time of the contracting. *See* E. Farnsworth, *Contracts* § 77.7, at 478 (1982) ("The language of a contract is directed, not at describing experience, but at controlling human behavior.... The concern of the court is not the truth of this language but with the expectations that it aroused in those parties."). In contracts of insurance, however, Hawaii law applies a strict form of the rule of construction against the drafter of a contract. *See Hurtig v. Terminix Wood Treating & Contracting Co.,* 692 P.2d 1153, 1154 (Hawaii 1984) ("[I]nsurance policies must be construed liberally in favor of coverage because they are contracts of adhesion."). Thus in examining the entire contract to ascertain and fulfill the reasonable expectations of the parties, *see Sturla, Inc., v. Fireman's Fund Ins. Co.,* 67 Hawaii 203, 209, 684 P.2d 960, 964 (1984), conflicts will be resolved in favor of the insured since MGIC controlled the language of the agreement.

With this background, the contract cannot be read to exclude defense costs from the effect of the general rule of a liability policy. Given the prosecution of this suit, MGIC clearly intended to exclude attorneys fees from immediate payment. At the time critical to our inquiry, however, the time of contracting, it could not have been clear to insureds that they would not be protected from the costs of fees. Section 1(d) provides the coverage in clear language; section 5(c) (we *now* know) attempts to postpone that coverage pending determination of liability on the underlying claims. The language of section 5(c) simply is unclear in its attempt. Nowhere are "expenses" defined; nor is it explained how they differ from the broader category of "costs, charges and expenses" of section 5(a). As one court recently noted in following our previous discussion of this policy, "the large print giveth and the small print taketh away." *Little v. MGIC Indem. Corp.,* 649 F.Supp. 1460, 1465 (W.D.Pa. 1986). Were the effect of the "small print" exception clear, we could not uphold the district court's interpretation. Where, however, the attempted disclaimer is unclear, the insureds reasonably could have believed that contemporaneous payment for legal defense was assured. *See Hurtig,* 692 P.2d at 1154 ("Coverage exists under the policy unless the exclusions clearly provide otherwise."). To rule otherwise would be to force insureds to rewrite a contract that they have no power to rewrite.

Our decision need not create havoc in the already disturbed field of D & O liability insurance.[2] Reports discussing policies similar to the one at hand demonstrate a wide variety of policy language.[3] The leading policy in this field, Lloyd's of London's "Lydando No. 1," upon which the MGIC policy appears to be based, contains references to costs, charges, and expenses in general. When the policy means to refer to defense costs, however, it expressly does so, avoiding the confusion that is MGIC's

---

2. *See* Comment, *Void Ab Initio: Application Fraud as Grounds for Avoiding Directors' and Officers' Liability Insurance Coverage,* 74 Calif.L. Rev. 929, 929 (1986).

3. Compare the MGIC policy with the policy interpreted in *Pepsico, Inc., v. Continental Casualty Co.,* 640 F.Supp. 656, 659–60 (S.D.N.Y.1986), and other policies discussed therein.

downfall here. *See* Lloyd's Lydando No. 1 Policy Form § 6(C), *reprinted* in Hinsey, *The New Lloyd's Policy Form for Directors' and Officers' Liability Insurance—An Analysis*, 33 Bus.Law. 1961 (1978).

This result works no particular hardship on MGIC. MGIC's liability is limited to losses incurred with covered claims. Section 3 of the policy defines claims that are not covered, and therefore the claims upon which MGIC need not pay for the directors' defense. As the district court found, the coverage may be determined by the nature of the underlying complaint. 608 F.Supp. at 389. For example, if a libel claim is filed against a director, MGIC need not pay for the legal defense, since section 3(a)(1) expressly excludes libel and slander claims from coverage. Complaints based on the first four exceptions (libel and slander, illegal profit or advantage, illegal compensation, and short-swing profits) should be easily determined from the pleadings.

The one exclusion from coverage that may be difficult to determine from the pleadings, section 3(a)(5), employs a mechanism to meet this problem. Section 3(a)(5) excludes loss brought about by the "active and deliberate dishonesty" of the directors. The exclusion is subject to a special provision that mandates payment unless a final judgment has been rendered confirming the directors' dishonesty. Section 3(a)(5) thus broadens coverage for the one case where coverage cannot be determined until judgment is reached. The district court in *Little* reached this same conclusion. *Little*, 649 F.Supp. at 1465.

■ If an action against the directors incorporates both covered and uncovered claims, the parties must apportion the costs so that MGIC need only pay for amounts generated in defense of covered claims. The apportionment of costs between covered and uncovered claims may be a troublesome problem, but it is one often met under these policies.[4] It is certainly no reason to accept MGIC's characterization of the agreement.

■ This suit was instituted at the behest of directors who refused to accept MGIC's reservation of rights regarding the costs advanced. MGIC may, of course, in payment of costs on covered claims as those costs come due, reserve its rights pursuant to the contract should the claims ultimately prove uncovered. For example, MGIC, while advancing costs, may reserve its rights under section 3(a)(5) should the directors' acts ultimately prove intentional rather than negligent. The directors have a right to the contemporary payment of costs. They have no right, however, to the unconditional payment of costs, when those conditions were clearly and unequivocally expressed.

We conclude that the district court correctly ruled that MGIC must make contemporaneous payments for legal defense on claims covered by the policy. MGIC may reserve its rights under the agreement, however, for the return of advances should the claims ultimately prove to be uncovered.

### IV.

■ MGIC argues that the district court finding of more than one potentially covered "loss" was premature, and that the evidence does not support the court's finding of more than one potential loss. The finding was not premature, however, because MGIC had paid more than $1 million. Because the policy limits are $1 million for each "loss," the court had to consider whether MGIC needed to pay any more defense costs. If more than one loss was involved, MGIC would continue to be responsible for the defense costs. The facts on which the district court based its finding are undisputed and, if true, establish that the district court was correct.

MGIC concedes that more than $1 million has been expended for defense costs in the underlying lawsuits, but argues that this

---

**4.** See W. Knepper, *Liability of Corporate Officers and Directors*, 642–43 (3d ed, 1978) (discussing the apportionment of defense payments between covered directors and the uncovered corporation).

amount is irrelevant because these defense costs are not a "loss" under clause 1(d), but rather an optional payment under clause 5(c). Therefore, MGIC argues, no "loss" has been paid; the first $1 million has not been expended, and it is unnecessary at this stage to determine whether another $1 million or more is available.[5] MGIC's argument rests primarily on its related argument that it had no duty to defend the underlying lawsuits. MGIC concedes that if it had a duty to defend then the defense costs would come out of the $1 million increments. However, its prematurity argument collapses because we find that it must make contemporaneous payments for legal defense on claims covered by the policy.

▆ The district court found that the underlying lawsuits alleged several distinct acts potentially covered by the MGIC policy.[6] The district court reasoned that more than one "loss" can culminate in one overall result, First Savings & Loan's failure, but one result does not require finding only one "loss." Finally, the court reasoned that the parties contemplated more than one loss because the directors chose a $1 million "per loss" policy rather than one with a $1 million ceiling.[7] Thus, the district court finding was timely and correct.

### V.

The district court improperly granted summary judgment on the issue of MGIC's bad faith. Summary judgment is appropriate only when " 'there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.' " *First Ins. Co. v. State*, 66 Hawaii 413, 416, 665 P.2d 648, 651 (Hawaii 1983) (citations omitted). None of the grounds on which the district court based its findings of bad faith—refusal to pay defense costs without reserving its rights, refusal to affirm or deny coverage, and failure to enter settlement negotiations—could have been resolved on summary judgment. MGIC argues that disputed material facts remain. We agree.

Moreover, it is unclear whether Hawaii would recognize a duty of good faith and fair dealing for insurance contracts, or bad faith for a breach of such a duty. Neither party cites Hawaii cases, the district court cites a California case for this proposition, and no Hawaii case appears to discuss this issue directly. We need not decide whether Hawaii would adopt this rule, however, because the district court improperly resolved the bad faith issues on summary judgment.

▆ The court erred in finding that MGIC acted in bad faith by advancing defense costs with a reservation of its rights to contest coverage and demand reimbursement. We agree with MGIC that it was reasonable to reserve its rights because coverage liability had not been resolved. *See First Ins. Co.*, 66 Hawaii at 422, 665 P.2d at 654 (discussing reservation of rights without discussing bad faith). We also agree with MGIC that its advancement of defense costs of more than $1 million in the underlying lawsuits raises a material factual dispute as to its good faith.

The district court also erred in finding bad faith in MGIC's refusal to affirm or deny coverage. This conduct was consistent with its reservation of rights to contest coverage. In addition, whether it refused to address the possibility of coverage is a disputed material fact.

Finally, the district court erred in finding that MGIC acted in bad faith by refusing to enter settlement negotiations on behalf of

---

**5.** The district court and both parties apparently agree that MGIC's duty to pay defense costs, if one exists, will end when the costs exceed the policy limits. It is unclear whether the agreement is based on the policy language that defense costs constitute a "loss" or on a general rule that the duty to defend lapses when the policy limits are exhausted.

**6.** For example, "(1) voting at separate times to authorize spot loans to home buyers; (2) authorizing five separate, unrelated large condomin-

ium project loans; [and] (3) ordering the move and renovation of corporate headquarters without having sufficient funds therefor."

**7.** The insureds chose the more expensive option for limits of liability, which provided for $1 million each loss, with an aggregate limit each policy year for each director and officer. The other option would have provided $1 million each year, regardless of the number of suits or the number of Directors and Officers insured.

the insureds in the underlying lawsuits. The court cites *ACandS, Inc. v. Aetna Casualty & Sur. Co.*, 666 F.2d 819 (3d Cir.1981), in support of its finding. That case holds that an insurance company has a duty to settle in good faith. MGIC does not contest this general rule. However, the record does not support the finding in this case because of material factual disputes; the breach of a duty to settle in good faith depends on the reasonableness of the insurer's conduct. MGIC contests the finding that it refused to enter settlement negotiations. MGIC argues that it did participate in settlement talks; that it asserted its right to participate in settlement negotiations, but that the defendants in the underlying action refused to allow MGIC to participate. The insureds concede that MGIC "insisted on its right to be present at settlement discussions."

Thus, because of the uncertainty as to whether Hawaii would adopt the insurance "bad faith" developments of other jurisdictions, and because the district court erred in resolving the issue on summary judgment when material facts were disputed, we reverse the finding of bad faith.

## VI.

We affirm the grant of summary judgment in favor of the insureds on the first two rulings: that the policy created a contemporaneous duty to pay costs and that the underlying lawsuits involved more than one potentially covered "loss." MGIC may reserve its rights under the contract for return of the advances should the losses ultimately prove uncovered. Because disputes of material fact remain, and because it is unclear whether Hawaii recognizes the duty of good faith and fair dealing in insurance contracts, we reverse the summary judgment on the ruling that MGIC acted in bad faith.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

* Hon. Philip C. Wilkins, Senior United States District Judge, for the Eastern District of Cali-