# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAN PACIFIC RETAIL PROPERTIES,
INC., a Maryland corporation;
WESTERN PROPERTIES TRUST, a real
estate trust,
          *Plaintiffs-Appellants,*

          v.

GULF INSURANCE COMPANY, a
Connecticut corporation; TWIN
CITY FIRE INSURANCE COMPANY, a
Minnesota corporation; DOES,
1-50, inclusive.
          *Defendants-Appellees.*

No. 04-56394

D.C. No.
CV-03-00679-WQH

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted
June 9, 2006—Pasadena, California

Filed October 26, 2006
Amended December 21, 2006

Before: Alex Kozinski and Ronald M. Gould, Circuit Judges,
and Ricardo S. Martinez,* District Judge.

Opinion by Judge Gould

*The Honorable Ricardo S. Martinez, United States District Judge for
the Western District of Washington, sitting by designation.

19657

## COUNSEL

Michael Bruce Abelson, Abelson Herron LLP, Los Angeles, California, for plaintiffs-appellants Pan Pacific Retail Properties, Inc. and Western Properties Trust.

David T. DiBiase, Anderson, McPharlin & Connors LLP, Los Angeles, California, for defendant-appellee Gulf Insurance Company. Stephen H. Sutro, Duane Morris LLP, San Francisco, California, for defendant-appellee Twin City Fire Insurance Company.

## ORDER

The Appellee Gulf Insurance Company's Petition For Panel Rehearing is GRANTED. The opinion of the court filed October 26, 2006 and published at 466 F.3d 867 is hereby AMENDED as follows:

After the second to last sentence in the opinion, stating "We remand for further proceedings consistent with this opinion," add a new footnote stating:

> We leave undisturbed the district court's grant of summary judgment dismissing Pan Pacific's claims for breach of the covenant of good faith and fair dealing and violation of California Business & Professions Code § 17200. *See Lunsford v. American*

*Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir.
1994) (applying California law and reversing district
court's summary judgment that there was no cover-
age under insurance policy, but holding as a matter
of law that the insurer did not deny coverage in bad
faith where insurer investigated the insureds' claim
and based denial on a reasonable construction of its
policy).

Pursuant to General Order 5.3(a), subsequent petitions for
rehearing or rehearing en banc may be filed concerning this
amendment.

**IT IS SO ORDERED.**

---

## OPINION

GOULD, Circuit Judge:

Appellants Pan Pacific Retail Properties, Inc. ("Pan Pacif-
ic") and Western Properties Trust ("Western") challenge their
insurers' denial of coverage for an underlying shareholder
class action. Pan Pacific and Western were each insured under
a Directors' and Officers' Liability and Company Indemnifi-
cation Policy ("D&O Policy"). Pan Pacific was insured by
Appellee Gulf Insurance Company ("Gulf"). Western was
insured by Appellee Twin City Fire Insurance Company
("Twin City"). Gulf and Twin City assert that all costs and
expenses arising out of the underlying shareholder lawsuit
were uninsurable as a matter of public policy because, accord-
ing to the insurers, the suit only sought and recovered the dis-
gorgement of additional consideration that the shareholders
allege should have been paid by Pan Pacific to Western's
shareholders in the merger of Pan Pacific and Western. Twin
City additionally contends that Western, its insured under the
Twin City policy, may not recover any insurance proceeds

because Pan Pacific had fully indemnified Western from any claims resulting from the merger.

We conclude that summary judgment was incorrect on the issue of whether the settlement paid by Pan Pacific to Western's shareholders to settle the remaining claims was entirely restitutionary relief, in light of the conflicting evidence as to the nature of these claims, and we reverse summary judgment on this ground. We affirm the grant of summary judgment to Twin City on the ground that Western was fully compensated from any loss by Pan Pacific's payment of the settlement and any other costs or expenses.

# I

In October 2000, Pan Pacific and Western proposed a merger transaction in a joint proxy statement and prospectus, whereby all shares of Western would be acquired by Pan Pacific with consideration paid in Pan Pacific stock. A class action brought by shareholder Bryant Bennett on behalf of all Western shareholders challenged many aspects of the merger. The *Bennett* complaint, which was filed in the Superior Court of California, Alameda County, alleged that Pan Pacific, Western and their directors and officers were liable for breaches of fiduciary duty, abuse of control, fraud and deceit, negligent misrepresentation, constructive fraud, unjust enrichment, and for four statutory violations under state law.[1] The complaint alleged, *inter alia*, that the *Bennett* defendants breached their fiduciary obligations to the shareholders by failing to negotiate the highest possible price for the Western shares, by engaging in related transactions between Pan Pacific and Western that created a conflict of interest, and by

---

[1]These statutory provisions, California Corporations Code §§ 1101, 25400, 25401 and 25402, required specified disclosures for the approval of a merger or the purchase or sale of stock and prohibited the use of false or misleading statements or omissions to induce the purchase or sale of securities.

failing to disclose all material information to the shareholders before they voted overwhelmingly to approve the merger.

On November 9, 2000, Western tendered notice of the *Bennett* lawsuit to Twin City which had issued a D&O Policy to Western.[2] The day after the merger closed on November 13, 2000, Pan Pacific tendered notice of the *Bennett* lawsuit to Gulf which had issued a D&O Policy to Pan Pacific. Both insurers denied coverage. Gulf's reasons, as set forth in its counsel's letter of December 21, 2000, included that: "Loss would not include . . . any award against or settlement by Pan Pacific representing increased consideration for its acquisition of [Western.]" Twin City stated in its letter of April 10, 2001, that: "If additional consideration were paid in connection with this matter, it would not constitute Loss."

On October 25, 2002, the state superior court issued an order partially granting the *Bennett* defendants' motion for summary adjudication. Because Bennett had not made a prior demand upon Western's board of directors, the superior court dismissed all derivative claims and allowed only direct claims to go forward. All claims in the *Bennett* action were dismissed except for the four claims based on violations of the California Corporations Code. The superior court stated that these statutory duties "run to the plaintiffs and not to the corporation." The claim for breach of fiduciary duty relating to the duty of disclosure was also permitted to go forward because the superior court held that shareholders had an individual "right to accurate information from their corporation." The

---

[2]"Despite its name, [a D&O policy] insures not only officers and directors themselves but also their corporation if, as happened here, the corporation indemnifies them for their liability. This is known as 'company reimbursement coverage,' as distinct from 'direct' coverage of the directors and officers." *Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 272 F.3d 908, 909 (7th Cir. 2001). Both D&O Policies also included coverage for liability by the company as a result of Securities Claims. Neither Policy obligated the insurer to provide a defense for their insureds.

*Bennett* action settled on February 7, 2003 for $975,000 plus $15,000 for administrative and notice costs.

On March 6, 2003, Pan Pacific and Western filed a complaint against Gulf and Twin City in the Superior Court of California, San Diego County. This complaint asserted claims of breach of contract, declaratory relief, breach of the covenant of good faith and fair dealing and unfair business practices, alleging that Gulf and Twin City unjustifiably refused to recognize any insurance coverage for the *Bennett* litigation. Gulf and Twin City removed the lawsuit to the United States District Court for the Southern District of California under diversity jurisdiction. On July 14, 2004, the district court granted summary judgment to Gulf and Twin City, concluding that the *Bennett* settlement was, as a factual matter, restitutionary relief that was uninsurable under California law. The district court also concluded that Gulf and Twin City did not breach their obligation to advance defense costs and expenses and were not required to reimburse expenses for the dismissed claims because these claims were also uninsurable as only seeking restitutionary relief. Finally, the district court held that Twin City was not obligated to pay any indemnification or reimbursement because its insureds, Western and its directors and officers, did not pay any damages, fees or costs as part of the *Bennett* litigation based on an indemnification agreement whereunder Pan Pacific agreed to pay all claims arising from the merger.

## II

We review the district court's grant of summary judgment de novo. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 n.4 (9th Cir. 2006); *see also Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 (9th Cir. 2000) (reversing grant of summary judgment because genuine issues of material fact remain "[n]otwithstanding the fact that both sides moved for summary judgment and agreed that summary judgment was appropriate one way or the other"). "Viewing

the evidence in the light most favorable to the nonmoving party, we must determine whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Cornwell*, 439 F.3d at 1027 (quoting *Oliver* v. *Keller*, 289 F.3d 623, 626 (9th Cir. 2002)). "If a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that [Appellants are] entitled to a verdict in [their] favor, then summary judgment was inappropriate." *Id.*

## III

In granting summary judgment for the insurers, the district court decided that the settlement paid by Pan Pacific in the *Bennett* action was uninsurable because the payment as a factual matter only reflected additional consideration that was wrongfully withheld in the merger.

"It is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired." *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266, 833 P.2d 545, 10 Cal. Rptr. 2d 538 (1992). In *AIU Insurance Co. v. Superior Court*, 51 Cal. 3d 807, 799 P.2d 1253, 274 Cal. Rptr. 820 (1990), the California Supreme Court provided guidance as to the types of remedies that are considered uninsurable restitutionary relief. The supreme court first interpreted the term "damages" in comprehensive general liability policies as requiring "compensation, in money, recovered by a party for loss or detriment it has suffered through the acts of another."[3] *Id.* at 826

---

[3]Under California law, policy language is interpreted in its "ordinary and popular" sense unless the parties expressed an intent otherwise. *See AIU*, 51 Cal. 3d at 826-27, 799 P.2d 1253, 274 Cal. Rptr. 820 (citing Cal. Civ. Code § 1644). The analysis by the California Supreme Court of "damages" was held to apply equally to other policies that covered "ultimate net loss." *See id.* at 842 n.19. We find no distinction for our analysis between the phrase "ultimate net loss" and the word "Loss," which was used in the Policies of Gulf and Twin City.

(footnote and internal quotation marks omitted). Based on this interpretation, the supreme court held that the "agencies' expenditure of federal funds to investigate and initiate cleanup of hazardous waste constitutes 'loss' or 'detriment' " and that "reimbursement by responsible parties is monetary 'compensation' for such loss." *Id.* at 828. The court further held that although the "reimbursement of response costs is restitutive in that it attempts to restore to the agencies the value of a benefit constructively conferred on [the insured]," it "is not restitutive in the narrow sense identified by *Jaffe* as inappropriate for insurance coverage." *Id.* at 836 (citing *Jaffe v. Cranford Ins. Co.*, 168 Cal. App. 3d 930, 214 Cal. Rptr. 567 (1985)).[4]

**[1]** The insurance companies here were required to cover claims that sought compensation for a loss, even if the loss to the victim could also be construed as an ill-gotten benefit to the insured. *See Jaffe*, 168 Cal. App. 3d at 935, 214 Cal. Rptr. 567 ("Although the concept of 'restitution' may have a broader meaning in other contexts, we limit our reference to it here to situations in which the defendant is required to restore to the plaintiff that which was wrongfully acquired."). In deciding whether a certain remedy is insurable, we must look beyond the labels of the asserted claims or remedies. *See Bank of the West*, 2 Cal. 4th at 1270, 833 P.2d 545, 10 Cal. Rptr. 2d 538. An insurer is not required to provide coverage for claims seeking the return of something wrongfully received, but must still indemnify for claims that seek compensation for injury suffered as a result of the insured's conduct. *Id.* at 1268.

In *Level 3 Communications, Inc. v. Federal Insurance Co.*, 272 F.3d 908 (7th Cir. 2001), the United States Court of Appeals for the Seventh Circuit held that the settlement of a

---

[4]In *Jaffe v. Cranford Ins. Co.*, 168 Cal. App. 3d 930, 214 Cal. Rptr. 567 (1985), the appellate court held that the recovery of funds overpaid to health care providers by Medi-Cal involved restitutionary relief outside the scope of covered "damages." *Id.* at 935.

claim alleging the purchase of stock under false pretenses was restitutionary relief even though the plaintiffs did not recover the actual shares allegedly acquired wrongfully, but only the difference in value between the price of the shares at the time of trial and the price the plaintiffs received for the stock from the defendant. *See id.* at 910. The appellate court held that the plaintiffs sought by this measure of damages "to deprive the defendant of the net benefit of the unlawful act, the value of the unlawfully obtained stock minus the cost to the defendant of obtaining the stock." *Id.* at 911.

The district court here relied on *Level 3* in holding that the amount paid in the *Bennett* settlement reflected restitutionary damages because the *Bennett* plaintiffs sought only the payment of additional consideration that was allegedly underpaid to the shareholders in the merger. We must examine whether any genuine issues of material fact remain as to the nature of the claims reflected in the settlement and whether any of these claims may have sought non-restitutionary compensation for injuries suffered by the shareholders, which would be covered under the insurers' Policies.

Before the settlement of the underlying *Bennett* class action was approved, the state superior court had dismissed all derivative claims that sought relief on behalf of the corporation. The superior court held that only certain claims alleging violations of the Appellants' disclosure duties could proceed as direct claims because each shareholder has an individual right to accurate information from the corporation. The superior court did not attempt to determine how a remedy or damages could be determined from this breach, but only that these claims alleged a direct injury to the shareholders. *See Bennett v. Western Properties Trust*, No. C-83307, Order—Mot. for Summ. Adjudication—Partial Grant (Cal. Super. Ct., County of Alameda, Oct. 25, 2002) ("The inquiry is not about the nature of the remedy, but determining whether (a) the corporation has been injured and the shareholders have conse-

quently suffered loss in the value of their holdings (derivative claim) or (b) the shareholders have suffered a direct injury.").

**[2]** Although the settlement occurred after the superior court had dismissed all claims except the direct claims, which removed all derivative claims from the pending state court lawsuit, it cannot necessarily be said that the settlement payment was solely in consideration of the then-pending direct claims. It is possible that a portion of the settlement, or even most or all of the settlement, was motivated by concerns of Appellants and their officers and directors about potential exposure on appeal of the dismissed claims. It is conceivable that the state court's dismissal of the derivative claims could have been reversed on appeal, and Appellants may have wanted to eliminate any lingering exposure from the dismissed derivative claims.

The derivative claims sought relief based on injuries to the corporation and only indirectly to the shareholders, in particular the decreased consideration paid for the shareholders' shares. *See Jones v. H. F. Ahmanson & Co.*, 1 Cal. 3d 93, 106, 460 P.2d 464, 81 Cal. Rptr. 592 (1969). ("A shareholder's derivative suit seeks to recover for the benefit of the corporation and its whole body of shareholders when injury is caused to the corporation that may not otherwise be redressed because of failure of the corporation to act."). Such derivative claims would necessarily seek to divest money that was improperly obtained or withheld by Appellants.[5] Any pay-

---

[5]Appellants argue that Pan Pacific could not have received an "ill-gotten gain" that was returned in the settlement because Pan Pacific, as the acquiring company, did not owe any fiduciary duty of disclosure to the *Bennett* plaintiffs. The *Bennett* complaint alleged that Pan Pacific was complicit in the wrongful acts of nondisclosure committed by Western. Regardless of whether Pan Pacific actually breached a fiduciary duty or committed a wrongful act, if Pan Pacific made a payment to settle a claim that sought the return of wrongfully acquired property as defined by California law, such a payment would be on behalf of a claim that was uninsurable as a matter of public policy and thus not covered by insurance.

ments intended to settle these claims would be uninsurable as seeking to recover the net benefit of the alleged wrongful acts committed by the Appellants. *See Level 3*, 272 F.3d at 911.

However, Appellants may have been motivated by an additional reason to obtain a settlement and a release of all claims by the *Bennett* plaintiffs. Appellants produced declarations by the attorneys who participated on both sides of the underlying settlement negotiations stating the opinion that the derivative claims seeking additional consideration were no longer "a viable claim for relief" after the superior court's order. Conceivably, Appellants may have settled the *Bennett* action to avoid liability from the remaining direct claims in the on-going class action.

The insurers argue that the entire payment must be treated as additional consideration regardless of the nature of the claims reflected in the settlement, because there was no alternative source of damages offered by Appellants. However, Appellants have argued that the remaining direct claims did not reflect restitutionary relief based on the procedural history of the underlying *Bennett* litigation and have offered an alternative theory of damages for the remaining direct claims.

**[3]** California law provides that "a shareholder cannot bring a direct action for damages against management on the theory their alleged wrongdoing decreased the value of his or her stock (e.g., by reducing corporate assets and net worth)." *Schuster v. Gardner*, 127 Cal. App. 4th 305, 312, 25 Cal. Rptr. 3d 468 (2005) (internal quotation marks and emphasis omitted). We have held that "vague allegations about misrepresentations that caused [the plaintiff shareholder] to support the unsuccessful merger attempt and initiation of a receivership" were still derivative claims because "his only injury from those misrepresentations was the devaluation of his stock when Barbary Coast was taken over by the FDIC." *Pareto v. F.D.I.C.*, 139 F.3d 696, 700 (9th Cir. 1998). A claim based on the devaluation of stock was "clearly derivative"

because "that is an injury that fell on every stockholder, majority and minority alike, and fell on each on a per share basis." *Id.* Applying this precedent to the case before us, the settlement payments for the remaining direct claims could not have been based on a decreased value given for the Western stock, such as for a low share exchange ratio in a merger paid for by Pan Pacific stock, because such a valuation would be an injury that fell on every stockholder alike.

Perhaps recognizing that the remaining direct claims of non-disclosure could not provide damages based on the amount underpaid for the shares of Western stock, Appellants have provided an alternative theory of damages for the remaining direct claims that would provide compensation for the individualized harm of the shareholders and not for the return of money wrongfully withheld by Appellants. After the dismissal of the derivative claims, but before the settlement of the *Bennett* action, Appellants advanced a damages theory for the remaining claims based on the "value of the information" allegedly withheld in the failure to disclose material facts. As described by opposing counsel in the underlying *Bennett* action:

> [Appellants'] "value of information" theory essentially argued that [the] damages awarded were required to reflect the intrinsic value of specific information withheld, as opposed to the impact of such information on the marketplace. For example, [Appellants] argued that the Bennett plaintiffs would only be able to recover $10,000 for the suppression of an analyst's report which cost $10,000 to produce. They would not be entitled to collect $100,000 even if expert evidence established that a $100,000 swing in the Company's stock price would have resulted from the timely and proper release of such information withheld.

Decl. of Robert Retana in Supp. of Opp'n to Mot. for Summ. J. ¶ 6 n.1.

If the trier of fact accepted Appellants' characterization of the damages reflected in the settlement payments, then the *Bennett* plaintiffs would have recovered compensation in the settlement for the intrinsic value of the information withheld from the shareholders. Although Appellants may have benefitted from their failure to disclose material information, this "value of information" theory resembles the type of insurable damages allowed in *AIU* that sought compensation for a detriment suffered by the shareholders.[6] *See AIU*, 51 Cal. 3d at 836, 799 P.2d 1253, 274 Cal. Rptr. 820. Appellants' "value of information" theory provides an alternative source of damages based on the cost that it would take the shareholders as a class to obtain the same amount of information which was allegedly withheld by Appellants. Although it is possible that this damages theory might only result in "a minimal economic recovery," *see* Retana Decl. ¶ 7, and possible also that it might not account for the entire amount paid in settlement, the submission of evidence supporting the "value of information" theory does raise a genuine issue of fact as to whether the settlement contained nonrestitutionary amounts.[7]

---

[6]The insurers argue that this theory is insufficient to raise a genuine issue of material fact as to the nature of the settlement payments because there is no evidence that the *Bennett* plaintiffs advanced this theory for themselves in the underlying litigation. However, the evidence offered by Appellants is sufficient for a reasonable jury to conclude that the parties contemplated that this theory would have been used to measure the plaintiffs' damages at the upcoming trial in the *Bennett* action.

[7]Appellants argue by analogy to Delaware law that they could recover for non-disclosures that impair the economic interests or voting rights of shareholders. *See In re Walt Disney Co. Derivative Litigation*, 731 A.2d 342, 371-72 (Del. Ct. Chan. 1998), *aff'd in part and rev'd in part*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). However, other than the "value of information" damages theory, Appellants do not describe any non-restitutionary damages resulting from the alleged impairment of the shareholders' economic interests or voting rights. Because Appellants must raise a genuine issue that the settlement reflected non-restitutionary damages, we express no opinion as to the existence of any other types of damages suffered directly by the Western shareholders that might have also resulted in coverage.

**[4]** Claims asserted by shareholders challenging the actions of corporate participants in a merger need not only seek additional merger consideration. We conclude here that the record contained material issues of fact, and thus the district court erred in concluding that the entire settlement reached was for uninsurable relief. There was no trial in the district court regarding what was settled in the prior California state court action. There was no expert testimony provided concerning the exposures for defendants in the California state court case, on both dismissed claims that might be reversed on appeal or the pending claims that remained for state court trial. Based on the current record, we conclude that summary judgment was inappropriate: Factual findings relating to the nature of the settlement and whether it settled in any part non-restitutionary, direct claims of the shareholders are required here. Giving all reasonable inferences to the non-moving party, it cannot be said as a matter of law that the settlement related entirely to restitutionary relief sought in derivative or direct claims.

**[5]** We are not persuaded that the claims and exposures settled were entirely "of the narrow type identified by these cases as not a proper subject of coverage by insurance." *AIU*, 51 Cal. 3d at 836-37, 799 P.2d 1253, 274 Cal. Rptr. 820. Accordingly, the district court erred in granting summary judgment to the defendants, resolving that issue in light of the disputed and conflicting evidence before it.

## IV

Appellants also seek reimbursement of about $1.6 million spent on defense costs.[8] The insurers argue that defense costs are only entitled to reimbursement if incurred while defending

---

[8]The district court in this case discussed at length why the insurers were not obligated to provide a defense for Appellants or to advance defense costs to Appellants during the pendency of the *Bennett* litigation. Appellants do not challenge this aspect of the district court's ruling on appeal.

covered claims and that the claims alleged in the *Bennett* action were not covered claims because they sought only restitutionary remedies. "D&O policies generally do not obligate the carrier to provide the insured with a defense." *Helfand v. Nat'l Union Fire Ins. Co.*, 10 Cal. App. 4th 869, 879, 13 Cal. Rptr. 2d 295 (1992). "More likely, they require the carrier to reimburse the insured for defense costs as an ingredient of 'loss,' a defined term under the policy." *Id.*

The contractual language of the Policies issued by Gulf and Twin City defines "Loss" as sums incurred as a result of claims that were "covered" or "insured" by the Policies.[9] This contractual language limits reimbursement to costs incurred in the defense of claims that would be insurable under the Policies. Appellants point to circuit precedent requiring the advancement of defense costs for potentially covered claims. *See Gon v. First State Ins. Co.*, 871 F.2d 863 (9th Cir. 1989); *Okada v. MGIC Indem. Corp.*, 823 F.2d 276 (9th Cir. 1986). Those cases, which involved an insurer's duty to provide contemporaneous advancement of defense costs, *Gon*, 871 F.2d at 868-69; *Okada*, 823 F.2d at 282-83, are not controlling where the insureds only seek reimbursement of costs after the underlying litigation has ended. In an insurance coverage action, the insured has the burden to prove that the claim falls within the basic scope of coverage. *See Collin v. Am. Empire Ins. Co.*, 21 Cal. App. 4th 787, 803, 26 Cal. Rptr. 2d 391, 398-99 (1994). Because Appellants seek reimbursement after the underlying litigation has settled and no longer need to worry about the assertion of new types of claims or damages, Appellants must show that the expenses at issue were related to claims that actually fell within the basic scope of coverage. *See Okada*, 823 F.2d at 282 ("If an action against the directors incorporates both covered and uncovered claims, the parties

[9]Although the Policies include additional provisions regarding the advancement of defense costs, Appellants repeatedly insist that they do not challenge the district court's finding that the insurers were not required to advance defense costs.

must apportion the costs so that MGIC need only pay for amounts generated in defense of covered claims.").

If a lawsuit only sought damages that were uninsurable under the policy, then the insurer would not be liable to reimburse any defense costs spent defending these claims, even if the claims were eventually determined to be meritless. In *State Farm Fire & Casualty Co. v. Drasin*, 152 Cal. App. 3d 864, 199 Cal. Rptr. 749 (1984), the state appellate court held that an insurer lacked any duty to defend or indemnify a malicious prosecution claim because any recovery would necessarily require proof of uninsurable willful conduct:

> The malicious prosecution complaint filed against the Drasins does not potentially seek damages that come within the coverage of the subject policy. If the Drasins' original action against Covell is held to be without malice and therefore not wilful, then there is no liability under the policy. Similarly, if the Drasins' original action against Covell is held to be wilful and with malice, again there is no liability under the policy.

*Id.* at 868. If the claims in the *Bennett* action only sought restitutionary relief that was uninsurable under California law, then the insurers would have no obligation to reimburse Appellants' defense costs regardless of whether the *Bennett* plaintiffs actually recovered on their claims or not.

As discussed above, the district court's grant of summary judgment was incorrect on the issue whether the *Bennett* settlement was in any part intended to settle direct claims that fell within the scope of the Policies. If the trier of fact determines that the settlement should not be characterized in full as reflecting uninsurable restitutionary relief and finds that the insurers must reimburse Appellants for any part of the settlement, then the defense costs reasonably related to these covered claims must also be reimbursed. *See Safeway Stores, Inc.*

*v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1282, 1289 (9th Cir. 1995) (holding "that Safeway's defense costs are reasonably related to the defense of its officers and directors in the class-action suits and are therefore fully covered by the D & O policy").

**[6]** Because a genuine issue of material fact remains as to the nature of the claims reflected in the settlement and the extent that these settled claims sought restitutionary relief, we cannot say that the district court's denial of all reimbursement for defense costs was appropriate. We reverse the district court's denial of reimbursement for defense costs and remand for further consideration by the trier of fact on this issue.

**V**

Twin City offered an alternative defense for its refusal to indemnify or reimburse any amounts incurred as a result of the *Bennett* action, and the district court gave relief to it on this alternative theory. Twin City argued that neither Western nor its officers and directors were required to pay any of the expenses, defense costs or settlement payment at issue in this coverage action and therefore no insured had suffered Loss as defined by its Policy. Pan Pacific paid all amounts that Western or its directors and officers were legally obligated to pay as a result of the *Bennett* action based on an indemnification provision included in the merger agreement.

Western seeks coverage based on two different types of coverage provided in the Twin City Policy. Insuring Agreement B(1) provides "Company Reimbursement" coverage where the insurer agreed to "pay on behalf of the Company Loss for . . . which the Company has, to the extent permitted or required by law, indemnified the Directors and Officers, and which the Directors and Officers have become legally obligated to pay as a result of a Claim . . . where such Claim is first made during the Policy Period . . . against the Directors and Officers . . . for a Wrongful Act which takes place during

or prior to the Policy Period." In Insuring Agreement C, under the caption "Company Securities Claim Liability," Twin City agreed to "pay on behalf of the Company Loss . . . which the Company shall become legally obligated to pay as a result of a Securities Claim first made during the Policy Period . . . against the Company for a Wrongful Act which takes place during or prior to the Policy Period."

**[7]** An insurance policy may be either for liability or for indemnity. " 'In a liability contract, the insurer agrees to cover *liability* for damages. If the insured is liable, the insurance company must pay the damages. In an indemnity contract, by contrast, the insurer agrees to reimburse expenses to the insured that the insure[d] is liable to pay and has paid.' " *Okada*, 823 F.2d at 280 (quoting *Continental Oil Co. v. Bonanza Corp.*, 677 F.2d 455, 459 (5th Cir. 1982)).

In Insuring Agreement B(1), Twin City agreed to reimburse the Company for all Loss for which the Company has indemnified its directors and officers. The requirement that the Company "has indemnified" its directors and officers appears to require that the Company must in fact make payments on behalf of its officers and directors. A requirement that the Company make actual payments on behalf of its directors and officers agrees with the caption "Company Reimbursement," which is typically considered to require an out-of-pocket loss by the party seeking reimbursement.

**[8]** The definition of "Loss" in the Twin City Policy also anticipates that Insuring Agreement B(1) will not be treated as a liability policy, which would only require that the insureds incur a legal obligation to pay damages or other expenses for indemnification by the insurer. The Policy defines "Loss" as "sums which the Directors and Officers or, with respect to Insuring Agreements B(2), C and D, the Company, are legally liable to pay solely as a result of any Claim insured by this Policy . . . ." The exclusion of Insuring Agreement B(1) from the Policy's definition of "Loss" implies that

something more than mere legal liability is required for reimbursement under Insuring Agreement B(1). In an indemnity policy " 'the insurer agrees to reimburse expenses to the insured that the insure[d] is liable to pay and has paid.' " *Okada*, 823 F.2d at 280 (quoting *Continental Oil*, 677 F.2d at 459); *see also* William E. Knepper & Dan A. Bailey, 2 *Liability of Corporate Officers and Directors* § 24.02 (7th ed. 2005) ("The only protection afforded the corporation under [Company Reimbursement Coverage] is reimbursement for its expenditures in indemnifying its director or officers."). Because Western has admitted that it made no payments on behalf of its directors and officers as a result of the *Bennett* action, Twin City is not required to reimburse Western under Insuring Agreement B(1).

[9] Western also sought coverage under Insuring Agreement C for Securities Claims made against the company.[10] Insuring Agreement C is a typical liability policy where the insurer must pay damages or expenses if the insured is legally liable as a result of a covered claim. *Okada*, 823 F.2d at 280. Western was legally liable to pay any expenses or damages incurred by Western as a result of the *Bennett* action, regardless of whether Pan Pacific had honored its indemnification agreement. To the extent that Western is seeking coverage under Insuring Agreement C, it has suffered a Loss and may be entitled to indemnification by Twin City.

[10] Despite Western's legal liability for these expenses, California law has been reluctant to allow an insured to obtain double recovery based on its insurance contracts. *See Bra-*

---

[10]At oral argument, counsel for Twin City stressed Western's attempted coverage for the costs incurred in the defense of Western's directors and officers that were submitted to Twin City for reimbursement under Insuring Agreement B(1). However, Twin City's briefing asserted that Western was not entitled to reimbursement or indemnification under either Insuring Agreement B(1) or Insuring Agreement C in the Twin City Policy. The district court also held that Western was not entitled to coverage under any provision of the Twin City Policy.

*malea Cal., Inc. v. Reliable Interiors, Inc.*, 119 Cal. App. 4th 468, 472-73, 14 Cal. Rptr. 3d 302 (2004). An injured party "could recover twice for the same loss only if the 'collateral source' rule applies." *Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal. App. 2d 506, 510, 64 Cal. Rptr. 187 (1967). Under this rule, if "an injured party receives compensation for his losses from a collateral source wholly independent of the tortfeasor, such payment generally does not preclude or reduce the damages to which it is entitled from the wrongdoer." *Id.* (internal quotation marks omitted).

**[11]** The collateral source rule has been held inapplicable to these types of insurance coverage disputes. After an insurer was found liable for breach of contract and breach of the implied covenant of good faith and fair dealing, the California Court of Appeals allowed the insurer to adjust the damages for its wrongful denial of coverage based on prior settlement amounts paid to the insured from other parties. *Plut v. Fireman's Fund Ins. Co.*, 85 Cal. App. 4th 98, 103-04, 102 Cal. Rptr. 2d 36 (2000). The appellate court rejected application of the collateral source rule, stating that it had "found no case expressly applying this rule in circumstances resembling those before [them], and the overwhelming weight of authority in California and other jurisdictions has rejected the extension of the collateral source rule to breach of contract." *Id.* at 107. "The collateral source rule, if applied to an action based on breach of contract, would violate the contractual damage rule that no one shall profit more from the breach of an obligation than from its full performance." *Patent Scaffolding*, 256 Cal. App. 2d at 511, 64 Cal. Rptr. 187 (holding that the insured "suffered no uncompensated detriment caused by Simpson's breach of contract").

If Western was legally liable to pay damages or costs as a result of the *Bennett* action, then Twin City's failure to pay would be a breach of its insurance contract with Western. However, if Western was fully compensated by Pan Pacific's indemnification agreement and never made any payments

itself, then Western should not obtain double recovery from Twin City based on its multiple agreements for indemnification.[11] California case law states that an insurer may offset its contractual obligation to pay the insured against any previous payments made by other parties that have already compensated the insured for its loss:

> [W]here multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor . . . . The fact that several insurance policies may cover the same risk does not increase the insured's right to recover for the loss, or give the insured the right to recover more than once. Rather, the insured's right of recovery is restricted to the actual amount of the loss. Hence, where there are several policies of insurance on the same risk and the insured has recovered the full amount of its loss from one or more, but not all, of the insurance carriers, the insured has no further rights against the insurers who have not contributed to its recovery. Similarly, the liability of the remaining insurers *to*

---

[11]Pan Pacific and Western have remained distinct legal entities for purposes of this lawsuit despite the unifying effect of the merger. Appellants briefly argued in their reply belief that Western became part of Pan Pacific following the merger's closing and that "the overall value of the merged Pan Pacific-Western enterprise was materially diminished by Twin City's breach." However, Western has not provided evidence to show that Pan Pacific's indemnification of Western did not have the effect of reimbursing Western against loss. Given that Pan Pacific and Western are separate legal entities for purposes of this lawsuit, Western has not shown why Pan Pacific's payment of all expenses and claims did not fully compensate Western for any loss that Western now asserts against Twin City.

*the insured* ceases, even if they have done nothing to indemnify or defend the insured. They *remain* liable, however, for contribution to those insurers who have already paid on the loss or for the insured's defense.

*Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 65 Cal. App. 4th 1279, 1295, 77 Cal. Rptr. 2d 296 (1998) (emphasis in original).

**[12]** Western does not have a right to recover twice for the same loss. While we express no opinion whether Twin City could possibly be obligated to contribute to the party that has paid for the loss,[12] Twin City does not have any further obligation to Western.

## VI

We reverse the district court's grant of summary judgment to Gulf on the issue of whether the settlement, including any defense costs or expenses reasonably related to the claims incorporated therein, constituted matters entirely uninsurable under California law. We affirm summary judgment for Twin City on the determination that Twin City was not obligated to indemnify or reimburse Western. We remand for further proceedings consistent with this opinion.[13] Each party shall bear its own costs.

---

[12]Pan Pacific has not asserted in this action a claim directly against Twin City for the recovery of Pan Pacific's expenditures on behalf of Western. Therefore, we need not determine whether Pan Pacific or Twin City should be held primarily responsible for the expenses and damages paid by Pan Pacific on behalf of Western. *See Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal. 3d 622, 634, 532 P.2d 97, 119 Cal. Rptr. 449 (1975).

[13]We leave undisturbed the district court's grant of summary judgment dismissing Pan Pacific's claims for breach of the covenant of good faith and fair dealing and violation of California Business & Professions Code § 17200. *See Lunsford v. American Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994) (applying California law and reversing district court's summary judgment that there was no coverage under insurance policy, but holding as a matter of law that the insurer did not deny coverage in bad faith where insurer investigated the insureds' claim and based denial on a reasonable construction of its policy).

**AFFIRMED in part, REVERSED in part, and REMANDED.**